**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19 CV 21121**

HAMED WARDAK,

      Plaintiff,

v.

SARAH GOOLDEN and BRIAN
CAVANAUGH,

      Defendants.

_____/

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

The Plaintiff, Hamed Wardak ("Mr. Wardak"), by and through the undersigned counsel,

sues Defendants, Sarah Goolden ("Ms. Goolden") and Brian Cavanaugh ("Mr. Cavanaugh"), and

hereby alleges:

**Parties**

1.      Mr. Wardak is over the age of 18, a citizen of the United States of America, and

resides in Puerto Rico, and is otherwise sui juris.

2.      Ms. Goolden is over the age of 18 and a resident of New York County, New York,

and is otherwise sui juris.

3.      Mr. Cavanaugh is over the age of 18 and is a resident of Suffolk County, New York,

and is otherwise sui juris.

**Jurisdiction and Venue**

4.      Defendants Ms. Goolden and Mr. Cavanaugh are subject to the personal jurisdiction

of this Court inasmuch as they reside in the United States.

5.      Defendants Ms. Goolden and Mr. Cavanaugh are subject to Florida statutory liability pursuant to Section 48.193(1), Florida Statutes, because Ms. Goolden and Mr. Cavanaugh committed tortious acts within Florida, and caused injury to persons in Florida, as set forth more fully in this Complaint.

6.      Though Mr. Cavanaugh may not have been physically present in Florida while committing his tortious acts against Mr. Wardak, Mr. Cavanaugh transmitted telephonic, electronic, and written communications into Florida, and the causes of action brought against Mr. Cavanaugh arise from those communications, as set forth more fully in this Complaint.

7.      The Southern District of Florida is the appropriate venue for this action inasmuch as the causes of action alleged herein accrued in Miami-Dade County, Florida,

8.      To the extent any events occurred outside of the state of Florida, these actions were the continuation of a tort transitory in nature originally arising in Miami-Dade, Florida, or were the direct result of wire communications being sent into Florida and had the most significant impact in Florida.

9.      All conditions precedent to maintaining this action, if any, have been performed, waived, or excused.

### Introduction

10.      This matter arises out of Defendants' intentional scheme to implement a systematic, ongoing course of conduct with intent to defraud Mr. Wardak, with intent to obtain property from by false and fraudulent pretenses, representations, and promises or willful misrepresentations of a future act.

11.      Mr. Cavanaugh was licensed to practice law in the state of New York in 1997. However, on January 15, 2008, Mr. Cavanaugh pleaded guilty to federal felony mail fraud charges

and sentenced to 27 months of imprisonment.  As a result of this criminal fraudulent endeavor, Mr. Cavanaugh was disbarred on July 10, 2008.[1]  Also, his civil liberties, such as the right to vote, were accordingly revoked.

12.     Mr. Cavanaugh is Ms. Goolden's father.

13.     Ms. Goolden is a model and a student at Colombia University where she is working to achieve a degree in journalism.

14.     Mr. Wardak is a wealthy businessman, known in the community for his lucrative businesses, including but not limited to his music career.  He also happens to be of Afghani origin.

15.     Mr. Wardak and Ms. Goolden met in 2010.  Ms. Goolden knew at the time of their meeting and throughout the parties' entire relationship that Mr. Wardak had considerable assets and wealth.

16.     Upon information and belief, Ms. Goolden informed her father, Mr. Cavanaugh of Mr. Wardak's wealthy means.

17.     Beginning at a point unknown to Mr. Wardak and known only by the Defendants, Mr. Cavanaugh and Ms. Goolden- having identified Mr. Wardak as a target- conspired together and began a secret plan to dupe Mr. Wardak into believing that Ms. Goolden had romantic feelings for him, that she was sincere in these feelings, and that she intended to be his partner and marry him solely for the purpose of inuring personal financial benefit.

18.     This secret plan culminated into a deliberate scheme to defraud Mr. Wardak through misrepresentations of Ms. Goolden's romantic intentions, including a systematic, ongoing course of conduct with the intent to defraud Mr. Wardak and to obtain money and property from

---

[1]  A copy of the Memorandum and Order disbarring Mr. Cavanaugh is attached hereto as **Exhibit A**.

Mr. Wardak by false promises of marriage and a lifelong partnership (the "Scheme").

**The Scheme**

19.     In fact, the Scheme was an intentional deception.  Ms. Goolden did not love Mr. Wardak, she had no intention of ever marrying him, and she was secretly still romantically entangled with other men.

20.     Mr. Cavanaugh actively participated in the Scheme by pretending to serve as an intermediary and confidant, pressuring Mr. Wardak with instructions to provide Ms. Goolden with cash to make sure she was "properly taken care of" and facilitating the "relationship" between Mr. Wardak and Ms. Goolden.

21.     Mr. Cavanaugh sent multiple emails and text messages with instructions to Mr. Wardak while Mr. Wardak was physically present in Miami, Florida, on how much money was to be given to Ms. Goolden as proof that Mr. Wardak was "taking care of her."

22.     Ms. Goolden told Mr. Wardak that she loved him and wanted to marry him for the sole purpose of defrauding him.  Mr. Cavanaugh falsely confirmed that his daughter loved Mr. Wardak and pretended to encourage the courtship for the sole purpose of defrauding him.

23.     As a direct result and solely on account of these deceptions, Mr. Wardak paid for Ms. Goolden's living expenses, wired her money, purchased gifts and clothing for Ms. Goolden, paid for Ms. Goolden to go on elaborate trips, and ultimately bought a $200,000 Harry Winston 5-carat diamond engagement ring (the "Engagement Ring") for her after receiving pressure from Ms. Goolden to propose under threat of her leaving him.

24.     As a direct result and solely on account of these deceptions, Mr. Wardak also wired Mr. Cavanaugh money and paid for attorneys fees and legal services to help restore Mr. Cavanaugh's civil rights in connection with his conviction of the felonious fraud charge.

25.     Ms. Goolden represented that she wanted to live with Mr. Wardak, specifically that she wanted him to move to New York to be with her, since she was going to be attending journalism school at Columbia University.  In fact, Ms. Goolden informed Mr. Wardak that Mr. Wardak needed to lease a three-bedroom penthouse apartment in West Chelsea (the "West Chelsea Apartment") for the couple to move into in order to prove that he loved her.  It was Ms. Goolden's best friend, Faris, who picked out the location that would be acceptable for Ms. Goolden.  Mr. Wardak signed the lease for the West Chelsea Apartment sometime at the end of July, for a monthly rate of $32,500.

26.     Mr. Wardak and Ms. Goolden got engaged to be married on July 6, 2018, at the Fontainbleau Miami Beach Hotel.

27.     In preparation for the proposal, Mr. Wardak made extravagant financial accommodations for Ms. Goolden and her friends to travel to Miami for the Fourth of July weekend, including airfare, luxury hotel suites, yacht rentals, multiple fancy meals for a party of 20 or more at expensive restaurants.  All of these accommodations for the entire weekend (the "Engagement Weekend") were made pursuant to Ms. Goolden's requests or outright demands with the understanding that the couple were to become engaged that weekend.

28.     It was shortly after Ms. Goolden received the Engagement Ring, however, that she began to take off the fraudulent mask she wore to perpetuate the Scheme and cease her false pretenses of loving Mr. Wardak.

29.     Her behavior changed drastically.

30.     Ms. Goolden had previously outright commanded Mr. Wardak to propose to her. On the night of July 5, 2018, she informed him that if he did not buy the Engagement Ring and propose to her the next day, she would leave him.  The next morning, her best friend, Ferris,

accompanied Mr. Wardak to the Harry Winston store located in the Bal Harbour Shops in Miami Florida, for the specific purpose of making sure Mr. Wardak purchased the "correct" Engagement Ring pursuant to Ms. Goolden's instructions.

31.     Ms. Goolden acknowledged that she "actively participated in everything and wanted everything."

32.     But suddenly, in a complete 180 to her demands for a proposal and specifically for the presentation of the Engagement Ring, Ms. Goolden claimed to have "commitment issues" that it was "hard for her to feel loved" and that she couldn't "handle everything moving so fast." Notwithstanding, she did not indicate that she wanted to call of the engagement, and the couple discussed having a long engagement period.

33.     Her sudden "change of heart" was so stark and so downright unbelievable, even her own friends were confused as to how she could have insisted that Mr. Wardak give her a marriage proposal and now suddenly be unsure of commitment.

34.      Claiming the need to visit her family to discuss their engagement, Ms. Goolden told Mr. Wardak she was going to take a trip to Syracuse, New York.

35.     Instead, she went to Ibiza, Spain, a renowned party-city, with Richard Abrazzi, whom Mr. Wardak would later learn to be another love interest of Ms. Goolden.  While in Ibiza instead of in Syracuse with her mother and grandmother, Ms. Goolden posted pictures and videos on her social media accounts showing prolific drug use, including cocaine.

36.     Ms. Goolden's behavior was so worrisome, even her best friend, Farris, felt compelled to confide in Mr. Wardak that "I just don't want her to do anything stupid and end up a criminal like her dad."

37.     In an attempt to understand what was going on with Ms. Goolden and how she was

feeling emotionally, Mr. Wardak pointed out that her sudden change in behavior came across as strange and potentially criminal even to her own friends.  At this point, Ms. Goolden stated she was sorry "for everything" and that she would "do whatever [she] could to make things right."

38.    However, Ms. Goolden never attempted to make things right.  Instead, she tried to walk away from her victim, having squeezed everything from him she believed she could before having to actually follow through with her fraudulent promises of partnership.  When she returned to the United States from Spain, she attempted to cut off all contact with Mr. Wardak.

39.    Having never been told that Ms. Goolden was calling off the engagement and without any explanation of what was going on with Ms, Goolden, Mr. Wardak made attempts to communicate with her but she blocked his messages, ignored his calls, and refused all contact.  To use the parlance of today's youth, Ms. Goolden "ghosted" Mr. Wardak.

40.    Having already signed the lease for the West Chelsea Apartment back in July and allowing for the approximate one-month application approval process, Mr. Wardak followed through with the move Ms. Goolden and Mr. Wardak had planned, moving into the West Chelsea Apartment in the beginning of September 2018.

41.    Ms. Goolden continued to refuse contact with Mr. Wardak.

42.    Then, when Mr. Wardak tried making demands for – at the very least- the return of the Engagement Ring, Ms. Goolden made efforts to get a restraining order in place to prevent Mr. Wardak from confronting her.

43.    On September 24, 2018, Ms. Goolden filed a police report[2] wherein she alleged:

the past few months hamed has been harassing, threatning and obsessively texting, emailing, and calling me. he has threatened to ruin my life. he has threatened to show up at my apartment and my father's house. he continually sends things to my apartment and my father's house. he continually sends things to my apartment and

---

[2] A copy of the Police Report is attached hereto as **Exhibit B**.

my father's house. he moved to new york in the same neighborhood a few weeks ago and i feel very unsafe. we had a brief relationship and i ended it in july, he proposed and i told him i did not want to continued the relationship and needed space. his obessiveness and threats worsened via text and email. upon this he started staring me, my friends and family constantly. harassing and involving my friends, family and involving everyone. he is creating many false accouns to stalk me and my friends and everything i am doing online. he is slandering me and making up lies about me

44.     When describing her prior incidents with Mr. Wardak, Ms. Goolden indicated: "harassment, blackmail, slander, verbal abuse, obsessive texting, emailing, and calling constantly to send things to [her] apartment and [Mr. Cavanaugh]'s house.  Threatening to ruing [her] life and threatening to show up at [her] house."

45.     Notably, the first words Ms. Goolden said to the responding officers were that she was "feeling harassed," but when asked whether Mr. Goolden made her feel fearful, she indicated "No" and when asked whether she had been injured, she also indicated "No."

46.     Notably, when asked if the physical violence increased in frequency or severity over the past 6 months, Ms. Goolden indicated "No."

47.     Notably, Ms. Goolden made no accusations of sexual assault at the time she first sought a restraining order against him, and in fact, denied it.

48.     As perhaps one of the first signs of Ms. Goolden's true original designs to engage in a relationship with Mr. Wardak under false pretenses solely for the spoils, on September 24, 2018, Ms. Goolden told Farris she would not return the Engagement Ring to Mr. Wardak.  In a serious of text messages she stated, "If I return the ring he's going to ask for more shit [.]  Sorry but not gonna return shit."

49.     At first, Mr. Wardak was concerned that Ms. Goolden was suffering from a very serious drug problem and attributed her erratic behavior to side effects of addiction.  He wanted to help her and attempted to get her to seek professional treatment; he did not want to believe that

Ms. Goolden had deliberately deceived him and had never loved him.

50.     Though Ms. Goolden's portion of the ruse had run its intended course, Mr. Cavanaugh had not finished milking their victim.

51.     Though Mr. Cavanaugh initially pretended to be angry with Mr. Wardak for an imaginary fight with Ms. Goolden, he soon realized that Mr. Wardak's genuine concern for Ms. Goolden was still financially exploitable and he continued on with the Scheme.

52.     Preying on Mr. Wardak's simultaneous affection for Ms. Goolden and fear that her drug abuse was causing her to behave in such an unstable manner, Mr. Cavanaugh pretended to "side" with Mr. Wardak, claiming he also shared in the worry over her substance abuse.  Mr. Cavanaugh falsely represented that he wanted to help Mr. Wardak and Ms. Goolden "reconcile." Mr. Cavanaugh made these representations knowing that Ms. Goolden's behavior was attributable solely to the fact that she had been defrauding Mr. Wardak the entire time and that Ms. Goolden and Mr. Wardak would never be able to reunite.

53.     Mr. Cavanaugh was incentivized to keep up this charade in furtherance of the Scheme because throughout the time that Mr. Cavanaugh was purporting to be Mr. Wardak's ally and confidant, Mr. Cavanaugh was also achieving financial gain from Mr. Wardak through direct wire transfers of funds and the payment of services, such as legal representation.

54.     However, on October 12, 2018, Kevin Goolden ("Kevin") (who is Ms. Goolden's brother and Mr. Cavanaugh's son), disclosed to Mr. Wardak that Ms. Goolden was acting intentionally.  Kevin outright told Mr. Wardak that Ms. Goolden had never been in love with Mr. Wardak at any point, had actually targeted Mr. Wardak from the very beginning with designs to implement her fraudulent Scheme, had been conning Mr. Wardak for money from the very beginning when they met nine years prior in a deliberate ploy to defraud him, and that Mr. Wardak

was not her first romantic victim.

55.     Not only did Ms. Goolden implement this long con on Mr. Wardak, but- in fact- Mr. Wardak was only one of at least four wealthy men she had also defrauded in this manner over the course of a decade.  The other men she duped into believing she loved for pure pecuniary gain were: Michal Sailor, Bill Dean, and an ice hockey player from Canada named Jose.

56.     Upon information and belief, Ms. Goolden also executed her romantic fraud scheme- wherein she duped a wealthy man into believing she loved him purely for pecuniary gain- upon Alex Pall, a member of the Grammy-award winning music duo the Chainsmokers.

57.     Kevin explained that he was appreciative of Mr. Wardak's genuine concern for Ms. Goolden, however stated unequivocally that Ms. Goolden did not have a drug problem, that the family had it under control, and that Mr. Wardak just needed to accept that she had never loved him and he needed to just "move on."

58.     Kevin admitted these facts about his sister to Mr. Wardak in the presence of Mr. Cavanaugh.  Though Kevin did not explicitly tell Mr. Wardak that Mr. Cavanaugh was in on the Scheme, he implicated a warning that Mr. Wardak should not trust Mr. Cavanaugh.

59.     When Mr. Wardak spoke to Mr. Cavanaugh about Kevin's disclosure, Mr. Cavanaugh dismissed the claims and encouraged Mr. Wardak to continue to believe it was the drug addiction- not the fraudulent enterprise- that was causing Ms. Goolden to act as she was.

60.     Mr. Cavanaugh intentionally curated this hopeful belief within Mr. Wardak in order to cover up his participation in the fraud, protect Ms. Goolden from liability, and to further the Scheme by continuing to benefit financially.

61.     Furthermore, and specifically in the context of Ms. Goolden's potential fraud liability, Mr. Cavanaugh sent Mr. Wardak a text message on December 20, 2019, insisting that he

does not believe that Ms. Goolden "would ever do anything to hurt" Mr. Wardak.  Mr. Cavanaugh made this statement knowing it to be false, as he had personal knowledge as a co-conspirator that Ms. Goolden had deliberately set out to cause Mr. Wardak financial harm.

62.     Mr. Cavanaugh further encouraged Mr. Wardak to "let go" and "move on" rather than seek legal remedies- changing his previous tune of possible reconciliation- once Mr. Wardak indicated he may bring a civil complaint for fraud against Ms. Goolden.

63.     Mr. Cavanaugh intentionally encouraged Mr. Wardak not to seek legal remedies in order to cover up his participation in the fraud, protect Ms. Goolden from liability, and to further the Scheme by continuing to benefit financially.

**The Cover Up and Smear Campaign Against Mr. Wardak**

64.     On December 26, 2019, almost six months after the Engagement Weekend, Mr. Wardak had still not heard from Ms. Goolden despite representations from Mr. Cavanaugh that he was "working on her" to facilitate a conversation.  Resigned to accepting Kevin's representations of the true nature of Ms. Goolden's intentions, Mr. Wardak sent Ms. Goolden an email asking for the return of his money and property she had fraudulently induced him to give her.  He further indicated that he believed that Ms. Goolden had intentionally defrauded him, that he had witnesses and evidence against her, and that he would file a legal complaint if she did not return what was dishonestly plucked from him.

65.     In an evident attempt to cover up her fraud, Ms. Goolden knowingly filed a false police report against Mr. Wardak and initiated an official proceeding in New York to procure a restraining order.

66.     On January 8, 2019, Ms. Goolden filed a petition for a no contact order[3] wherein

---

[3] A copy of the no contact order petition (the "Petition") is attached hereto as **Exhibit C**.

she intentionally downplayed the engagement, claiming that she merely had "a brief relationship" with Mr. Wardak, made horrendous public allegations regarding Mr. Wardak's family, as well as atrocious allegations against Mr. Wardak she knew to be untrue.

67.     Specifically, she stated Mr. Wardak

blackmailed me, threatened me, and harassed me and swore he would ruin my life if I wouldn't be with him.  He told me his father murdered his mother so just watch what he could do.  He rented an apartment in my neighborhood (moved from FL to stalk me) He has continued for 6 months now, harass and threaten me, my friends and my family members.  I have asked him to stop contacting me since July and he still won't stop.  I have blocked all his numbers and email addresses and he keeps making new email address to harass me on.

68.     Notably, Ms. Goolden made no accusations of sexual assault at the time she first filed the Petition against him.

69.     Because of the Petition filed by Ms. Goolden, a Temporary Order of Protection was entered ex parte on the same day.[4]

70.     After obtaining the temporary order of protection, Ms. Goolden's next move (likely guided by the advice of Mr. Cavanaugh who had at one point in time been a licensed attorney and had familiarity with the legal process) was to invite Mr. Wardak into unwittingly violating it.

71.     The day she achieved the temporary order, but before Mr. Wardak was aware of its existence, an unidentified person (the "Unidentified User") with the username "Mikeevans5309" sent private and aggressive messages to Mr. Wardak on his Instagram account.

72.     Upon information and belief, "Mikeevans5309" is not a legitimate user account, but a scam account created solely for the purpose of harassing Mr. Wardak.  Such an account is often referred to as a "burner account" or "fake account" which are commonly used for anonymously viewing other people's profiles, sending direct messages, or "online stalking."

---

4 A copy of the Ex Parte Temporary Order of Protection is attached hereto as **Exhibit D**.

73.     The Unidentified User is either associated with Ms. Goolden or Mr. Cavanaugh, Mr. Cavanaugh himself, or Ms. Goolden herself.

74.     The unsolicited direct messages the Unidentified User sent to Mr. Wardak on January 8, 2019, included:

a) "Nobody wants you for your money you're a stalker and a sick deranged mother fucker who needs a Fucking life.  Fuck u you stupid pile of dog shit.  Go to hell"
b) "She left u bc you're a crazy creepy deranged mother fucker"
c) "You have a baby dick"
d) "stop dealing weapons you pond scum"
e) "I heard your father killed your mother / What does that make you???"
f) "stop harassing my friend" "just stop" "it's over" "take the L"
g) "Seriously just stop. U harassed multiple people.  This has to end" "One way or another and ur really pissing me off buddy"
h) "You're a bully and a joke and a coward and u have no legitimate lawsuit.  U are the one who should be worried bc u are a stalker"
i) "Have u ever even been laid?  Like dude"
j) When Mr. Wardak asked the Unidentified User to identify themselves, the anonymous user responded "Your worst nightmare"
k) "I'll fuck u up"
l) "Do me a favor?" . . . "Die"

75.     It is not a coincidence that the Unidentified User chose to send these harassing messages to Mr. Wardak on the very same day the ex parte temporary order was entered but before Mr. Wardak had been provide a copy of it.  This was a deliberate attempt to induce Mr. Wardak to reach out to Ms. Goolden and unwittingly violate the order.

76.     This plot failed, as Mr. Wardak did not attempt to contact Ms. Goolden.

77.     However, a month later and immediately after having eye surgery, Mr. Wardak attempted to send an email from his phone to his New York attorney, Irene Sinayskaya.  Though the email specially addressed Ms. Sinayskaya, it was inadvertently sent to Ms. Goolden.  Clearly, based on the face of the email, Mr. Wardak sent the email to Ms. Goolden by mistake and was not making an attempt to contact her.

78.     Ms. Goolden knew that Mr. Wardak was not threatening or stalking her, and she

knew that the email inadvertently sent to her was a mistake.  But, seizing her chance to validate her false accusations of Mr. Wardak, Ms. Goolden immediately called the police and reported that Mr. Wardak harassed her.

79.     On February 11, 2019, the very day the Family Temporary Order was scheduled to expire, Mr. Wardak was arrested and spent several hours in jail.  A Temporary Criminal Order of Protection was also entered against Mr. Wardak.[5]  The Temporary Criminal Order of Protection temporarily suspended Mr. Wardak's legal rights, including his ability to acquire or possess a firearm.

80.     For months, Ms. Goolden continued with her ploy to have Mr. Wardak arrested multiple times in order to establish a false impression that Mr. Wardak was stalking her.  She would often show up to different clubs and venues where she knew Mr. Wardak would be, especially in instances where he would be performing in conjunction with his music career.

81.     For example, Mr. Wardak posted on his social media platforms that he would be at the Luna Party at the Knockdown Center thrown by Black Matt as a part of Techno Festival on May 17, 2019.  Ms. Goolden not only came to this venue knowing Mr. Wardak would be there, she tried to have Mr. Wardak removed on the basis of the Temporary Order.

82.     Representatives from Black Matt refused to eject Mr. Wardak, and actually required Ms. Goolden to leave the VIP section where Mr. Wardak was sitting.  Notwithstanding having been ejected from VIP and allegedly being afraid of Mr. Wardak, Ms. Goolden snuck back into the VIP section and had to be kicked out by Black Matt representatives a second time.

83.     Whenever she was in the presence of Mr. Wardak, she antagonized him and made overt displays of sexual affection to other men, including Richard Abrazi, with the malicious

---

[5] A copy of the February 11, 2019, criminal order of protection is attached hereto as **Exhibit E**.

intention of inducing Mr. Wardak to violate the temporary restraining order.

84.     However, she was unsuccessful in her all of these attempts apart from the one errant email addressed to Mr. Wardak's lawyer.

85.     Furthermore, as the legal proceedings progressed, Ms. Goolden's allegations of her past interactions with Mr. Wardak began to get more unsavory in character.  What was originally claims of mere threats and harassment, became steadily increasing accusations of assault.  Ms. Goolden was now making a previously unclaimed allegation that during the Engagement Weekend, Mr. Wardak had dragged her by the hair and dragged her across the bed.  Finally, in the summer of 2019, a full year from the Engagement Weekend, Ms. Goolden concocted outrageous allegations of sexual assault and rape.

86.     On June 17, 2019, Ms. Goolden provided testimony in the Family Legal Proceedings in which she willingly testified under oath that Mr. Wardak had raped her during the Engagement Weekend, knowing this testimony to be false.

87.     Throughout the legal proceedings, Mr. Cavanaugh was still receiving the benefit of Mr. Wardak's financial means, as Mr. Wardak was financing Mr. Cavanaugh's legal representation by Greenberg Traurig who were endeavoring to have Mr. Cavanaugh's civil liberties restored despite his status as a convicted felon.

88.     As it was still in Mr. Cavanaugh's immediate interest, he maintained his charade of being on Mr. Wardak's "side" throughout the legal proceedings initiated by Ms. Goolden.  Mr. Cavanaugh even went so far as to file a sworn statement with the court attesting to the fact that he did not believe Mr. Wardak to be a threat to Ms. Goolden.[6]

89.     Then, in May of 2019, Mr. Wardak notified Mr. Cavanaugh that he "decided to go

---

[6] A copy of Mr. Cavanaugh's Affidavit is attached as **Exhibit F**.

criminal" and that he wanted the return of his money, which he had estimated to be about 1 million dollars.  Mr. Cavanaugh knew that Mr. Wardak was talking about filing criminal charges against his daughter.

90.     Coincidentally, this happened to be around the time when Greenberg Traurig had finalized the requisite submissions for Mr. Cavanaugh's Certificate of Relief, so there was no risk of Mr. Wardak rescinding his financial support.

91.     This is the point where Mr. Cavanaugh stopped pretending to be on Mr. Wardak's "side" and also contributed to the legal proceedings by falsely claiming that Mr. Wardak had threatened to "assassinate" Ms. Goolden and her family.  Though absolutely untrue, this was sufficient to trigger another violation of the protective order, dooming Mr. Wardak to another arrest and more jail time.

92.     On or about May 24, Mr. Wardak voluntarily surrendered himself for arrest, and he spent another day in jail thanks to the false statement made to the police by Mr. Cavanaugh.

93.     Conversely, Mr. Cavanaugh received his Certificate of Relief, restoring his civil right to vote notwithstanding his felonious fraud conviction, thanks to the help provided by Mr. Wardak.

94.     In addition to initiating legal proceedings, antagonizing Mr. Wardak to induce violation of fraudulently obtained restraining orders, and causing Mr. Wardak to be arrested under fraudulent pretenses on two separate occasions, Ms. Goolden further attempted to disassociate herself from her romantic fraudulent and participation in the Scheme by attempting to assassinate Mr. Wardak's credibility and character.

95.     Without cause or possible explanation other than to cause damage Mr. Wardak's reputation, Ms. Goolden has engaged in a smear campaign against Mr. Wardak, making outrageous

claims to their mutual friends and his work affiliates.

96.     Some of the defamatory statements include describing Mr. Wardak as an "arms dealer," a "stalker," having a "baby dick," calling him a liar and denying the engagement, claiming that Mr. Wardak's father killed Mr. Wardak's mother and that Mr. Wardak's character prescribed the same behavior, and describing him as "evil" when she knows these statements to be false.

97.     The date that these statements were made or published are known only to Ms. Goolden.

98.     Ms. Goolden has told several affiliates with Mr. Wardak's music career that Mr. Wardak is an "arms dealer."  Ms. Goolden knows that Mr. Wardak is not an arms dealer and is not in the business of selling weapons.  This statement is particularly harmful based on Mr. Wardak's race, as he is from Afghanistan, and is intended to invite racial prejudices.

a)  Specifically, upon information and belief and presumably while she was in Miami, Florida, Ms. Goolden told the owners of the Space nightclub, which is a venue Mr. Wardak has been trying to book music performances at, that Mr. Wardak is an "arms dealer" and a "stalker."  Mr. Wardak has been unable to book any performances at the Space nightclub in Miami, particularly during Ultra Weekend in 2019.

b)  Specifically, upon information and belief and presumably while she was in Miami, Florida,  and/or her agent, Erin Gross, told Mateo Milleri and Carmine Conte, members of the disc jockey due Tale of Us, that Mr. Wardak is an "arms dealer" and a "stalker."  Tale of Us have refused to work with Mr. Wardak professionally because of these defamatory statements, particularly during Ultra Weekend in Miami in 2019.

c)  Specifically, upon information and belief and presumably while she was in Miami, Florida,  Ms. Goolden told Mateo Garzia that Mr. Wardak is an "arms dealer" and a "stalker."  Mr. Garzia is Mr. Wardak's manager, and works closely with booking Mr. Wardak gigs in Florida.  Subsequent to these

statements being made, Mr. Garzia, who works frequently with the owners of the Space nightclub, has not booked Mr. Wardak any performances at the Space nightclub.

d) Specifically, upon information and belief and presumably while she was in Miami, Florida, Ms. Goolden told Steve Martinez, James Zumarraga, and Alex Jas, who are all affiliated with the famous disc jockey duo, the Martinez Brothers, that Mr. Wardak is an "arms dealer" and a "stalker." Mr. Wardak had previously been friends with the Martinez brothers, but now the Martinez Brothers refuse to work with Mr. Wardak professionally because of these defamatory statements, particularly during Ultra Weekend in Miami in 2019.

99.     The full extent of the effect that these statements has had on Mr. Wardak's music career has not yet been fully realized.

100.    Ms. Goolden has also called Mr. Wardak a liar and denied the engagement.

101.    At a time known only to Ms. Goolden, she told her brother Kevin that Mr. Wardak, "got [her] drunk and a got a ring on [her] finger," not only mischaracterizing the events leading up to the engagement, but impugning Mr. Wardak's character.

102.    Ms. Goolden has deliberately engaged in this contact in order to assassinate Mr. Wardak's character and credibility so that she can avoid culpability for the fraud she has perpetuated.

103.    Furthermore, Ms. Goolden has engaged in dilatory practices regarding service of process and has encouraged witnesses to do the same.

104.    Specifically, after a technical insufficient process in the instant case, Ms. Goolden attempted to evade corrected service. After the process server made multiple attempts to serve her with a corrected pleading, Ms. Goolden evaded service and forced the process server to post the summons on the door. She then sought to have service quashed in the instant matter, knowing that

she had been properly served, for the sole purpose of causing delay.

105.    Then, upon information and belief, Ms. Goolden advised other witnesses to also evade service.

106.    Mr. Wardak attempted to serve subpoenas upon Erin Gross, Yura Shabetayev, and Richard Abrazi (collectively the "Potential Witnesses") for their depositions to take place in New York on June 4, 2019, at the Potential Witnesses' respective residents and work addresses.  Despite multiple and repeated attempts, the process servers were unable to effectuate service on any of the Potential Witnesses.

107.    It was not until Mr. Wardak paid a process server an exorbitant premium for a process server to stake out at a club – the Electric Room- on May 30, 2019, that Yura Shabetayev was successfully served, who accepted service on behalf of all of the Potential Witnesses.

108.    Had the Potential Witnesses not been evading service, they would have had ample notice for the depositions to occur on June 4, 2019.  However, because of their actions of avoiding process servicers- as instructed by Ms. Goolden or Mr. Cavanaugh- the notices were not provided to the Potential Witnesses with fourteen days' notice, arguably running afoul of the Southern District of Florida's Local Rule 26.1.

109.    Notwithstanding, Ms. Goolden, through her counsel, contacted the Potential Witnesses via email, and not only advised the Potential Witnesses that they need not appear for the June 4, 2019, depositions, but further informed them "not to respond to **any** subpoena served [upon them] until the Court rules on Defendant's motion to stay discovery." (emphasis added).[7]

110.    On July 5, 2019, seven months after the filing of the initial complaint in the instant

---

[7] A copy of the May 30, 2019 Letter advising witnesses not to respond to subpoenas served in this action is attached hereto as **Exhibit G**.

case, Ms. Goolden filed her own civil action in the Southern District of New York, case number: 19-CV-06257-JPO.

111.    After filing this complaint, but before even effectuating service on Mr. Wardak, Ms. Goolden engaged in a pretrial publicity campaign against Mr. Wardak in the state of New York, apparently giving a personal interview to the New York Post.[8]  Several other publications subsequently ran the New York Post Story, which has resulted in online commentators engaging in diatribes about Mr. Wardak's race, appearance, and the truth or falsity of the allegations of her suit.[9]

112.    Ms. Goolden, as a journalism major at Columbia University, knew what she was doing.  Ms. Goolden's immediate pretrial publicity campaign against Mr. Wardak in the state of New York has already resulted in polemics regarding Mr. Wardak's race, appearance, and the truth or falsity of the allegations in the underlying suit.  Ms. Goolden's attachment to the #MeToo movement and courting of racial and cultural atavism is deliberately aimed at unfairly undermining the truth.

**Defendant, Ms. Goolden's, Spoils from the Scheme**

113.    Based on these representations, Mr. Wardak truly believed that Ms. Goolden and he would be sharing a life together.  Because of this misplaced trust, Mr. Wardak used his financial means to pay off Ms. Goolden's debts, purchase her expense gifts, including clothing and elaborate trips.

114.    Mr. Wardak gave Ms. Goolden approximately $5,000 for her to spend for her brother's graduation on in late May early June 2018.

---

[8] A copy of the New York Post Story is attached hereto as **Exhibit H**.
[9] Screenshots of some of the articles available on the internet and included choice online commentary by readers is attached hereto as composite **Exhibit I**.

115.    For the months of May 2018 through July 2018, Mr. Wardak flew Ms. Goolden down business class or first to Miami from New York roughly three to four times a week, totaling approximately $4,000.

116.    In those the three months leading up to the Engagement Weekend, Ms. Goolden received approximately $30,000 in cash from Mr. Wardak while the couple were together in Miami to spend money on clothes, purses, shoes, gifts, and other such items almost exclusively purchased in the Bel Harbor Shops in Miami Florida.

117.    Mr. Wardak then paid for an additional "celebratory" shopping spree on July 6, 2018, in the Bel Harbor shops to celebrate their engagement totaling an approximate additional $40,000 spent almost exclusively at the YLS store in the Bel Harbor Shops in Miami Florida.

118.    During the Engagement Weekend in, Mr. Wardak spent extravagantly, pursuant to Ms. Goolden's representations that she was going to marry him, her demands as to specific expenses, and that this was to be a celebratory weekend.  All of these expenses were induced out of Mr. Wardak and spent in Miami, Florida.

    a) Yacht rentals – approximately $10,000
    b) Meals – approximately $7,000
    c) Clubs – approximately $20,000 at Liv
    d) Engagement Dinner at Scarpetta – approximately $10,000

119.    Ms. Goolden further induced Mr. Wardak to bankroll vacations and trips for her and several of her friends based on the deception that she was romantically committed to him. Specifically, these trips include:

    a) <u>Trip to Miami for Engagement Weekend</u>.  Mr. Wardak paid for Ms. Goolden and her friend to fly business class from New York to Miami and for Ms. Goolden's friend, Farris, to fly business class from London to New York to Miami and back to London, spending more than $10,000 in airline flights.  Mr. Wardak paid for her friends to fly into Miami specifically

because of her desire to have her friends present for their Engagement Weekend.

b) <u>May 12, 2018 trip to Syracuse to visit Mr. Cavanaugh</u>.  Mr. Wardak spent approximately $300 for the flight, and an additional $400 for a hotel after she got into a fight with her father.

c) <u>Trip to Puerto Rico</u>. In June, Mr. Wardak paid for Ms. Goolden and Mr. Cavanaugh to visit his home in Puerto Rico, which is where Mr. Cavanaugh and Mr. Wardak met in person for the first time.  In addition to these flights, while in Puerto Rico, Ms. Goolden insisted that Mr. Wardak pay for yacht rentals totaling almost $10,000 of Mr. Wardak's money.

120.    Not only did Mr. Wardak purchase clothes, gifts, and trips, but based on specific demands made by Ms. Goolden, Mr. Wardak wired cash funds to Ms. Goolden on more than one occasion while both Ms. Goolden and Mr. Wardak were physically in Miami.  Specifically:

a) Mr. Wardak wired Ms. Goolden $30,000.00 on May 29, 2018, because she indicated she needed the money for a personal loan she owed to her ex-boyfriend, Arthur; and

b) Mr. Wardak wired Ms. Goolden $41,000.00 on June 28, 2018, because she indicated she needed the money for taking care of Ms. Goolden's dog and also as proof that Mr. Wardak really loved her, that he would take care of her, and not attempt to control her.

121.    Mr. Wardak sent Ms. Goolden this money based on her representation that she needed it to pay debts, take care of her dog, and as a symbol of their mutual intent to be partners.

122.    In fact, not only did Ms. Goolden not need the money for her stated purpose and not only did she have no intention of spending her life with Mr. Wardak, but upon information and belief, Ms. Goolden was also receiving wire transfers from and/or sending wire transfers to other men she with whom was romantically involved at or around the same time.

123.    Through her participation in the Scheme, Ms. Goolden has received proceeds

totaling more than $217,700, almost exclusively fraudulently acquired in Miami Florida.

124.    This amount does not include additional funds Ms. Goolden has fraudulently induced Mr. Wardak to expend that did not directly result in a permanent benefit to Ms. Goolden, though was acquired in the furtherance of the Scheme.

125.    Ms. Goolden also obtained the Engagement Ring, which cost Mr. Wardak $200,000.  Though she has at this point returned the ring, she originally refused, and kept the ring for almost four months.  Now that it has been returned to Mr. Wardak, it has significantly decreased in value, and Mr. Wardak cannot return it to the jeweler at Harry Winston.  Had Ms. Goolden not represented that she intended to marry Mr. Wardak, he would not have purchased this ring.

126.    Mr. Wardak was also obligated to pay $32,500 a month for the lease of the West Chelsea Apartment insisted upon by Ms. Goolden for an entire year.  Had Ms. Goolden not represented that she intended to marry Mr. Wardak, he would not have signed a lease at this location, even upon his eventual move to New York.

### Defendant, Mr. Cavanaugh's, Spoils from the Scheme

127.    Preying upon Mr. Wardak's misplaced belief that Mr. Cavanaugh was Mr. Wardak's future father-in-law, Mr. Cavanaugh hoodwinked Mr. Wardak into retaining the law firm Greenberg Traurig to help Mr. Cavanaugh restore his civil liberties by obtaining a Certificate of Relief.

128.    Mr. Cavanaugh sent emails and wire communications in May of 219 to Mr. Wardak while Mr. Wardak was in Miami, Florida, asking for this favor.

129.    Mr. Wardak engaged legal services on Mr. Cavanaugh's behalf on May 30, 2019, agreeing to pay the legal fees associated with Mr. Cavanaugh's Certificate of Relief, which cost approximately $5,000.

130.   Not to be left out of the personal monetary gain, Mr. Cavanaugh further represented that he needed money for a personal trainer.  On October 10, 2018, Mr. Wardak wired $19,620 to Mr. Cavanaugh, again because he believed he was helping his future father-in-law.

131.   Through his participation in the Scheme, Mr. Cavanaugh has received proceeds totaling more than $27,620, plus non-monetary benefits such as obtaining the Certificate of Relief thanks to Mr. Wardak's funding of legal services.  These spoils result almost exclusively through the use of wire communications sent to Mr. Wardak while he was physically present in Florida or from fraudulently acquired funds sent directly from Miami Florida.

132.   Furthermore, had Ms. Goolden and Mr. Cavanaugh not represented that she intended to marry Mr. Wardak, he would not have purchased the Engagement Ring.

133.   Mr. Wardak was also obligated to pay $32,500 a month for the lease of the West Chelsea Apartment insisted upon by Ms. Goolden for an entire year.  Had Ms. Goolden and Mr. Cavanaugh not represented that she intended to marry Mr. Wardak, he would not have signed a lease at this location, even upon his eventual move to New York.

## COUNT I - Fraud
### (against Ms. Goolden)

134.   Plaintiff reasserts and realleges paragraphs 1 through 133 as though fully set forth herein.

135.   Ms. Goolden made misrepresentations concerning material facts such as 1) her feelings about Mr. Wardak; 2) her intention to marry Mr. Wardak; and (3) that she had was not engaging in any other romantic entanglements with any other men and was devoted to Mr. Wardak monogamously.

136.   Ms. Goolden knew that her misrepresentations were false. Specifically, she knew that she did not love Mr. Wardak, did not end her prior relationship, and never intended to marry

Mr. Wardak, but rather, she was operating a scam since the inception of their relationship solely designed to deceive Mr. Wardak and defraud him of his money.

137.    The misrepresentations made by Ms. Goolden and relied upon by Mr. Wardak would have been relied upon by a reasonable person.

138.    Ms. Goolden made her misrepresentations to induce Mr. Wardak to give her more than $217,700 in monetary gain to Ms. Goolden.

139.    Mr. Wardak has suffered significant financial injury due to his reliance on the representations by Ms. Goolden, totaling at least $807,700 of total costs to Mr. Wardak.

WHEREFORE, the Plaintiff, Hamed Wardak, demands judgment for damages against Defendant, Sarah Goolden, in the amount of $807,700 exclusive of interest and costs. The Plaintiff further demands prejudgment interest, costs and any other relief that this Court may deem just and equitable.

## COUNT II - Fraud
### (against Mr. Cavanaugh)

140.    Plaintiff reasserts and realleges paragraphs 1 through 133 as though fully set forth herein.

141.    Mr. Cavanaugh made misrepresentations concerning material facts such as 1) his daughter's feelings about Mr. Wardak; 2) his daughter's intentions to marry Mr. Wardak; and (3) that he was acting as an intermediary with the goal of reconciliation between Ms. Goolden and Mr. Wardak.

142.    Mr. Cavanaugh knew that his misrepresentations were false. Specifically, he knew that Ms. Goolden did not love Mr. Wardak, that she did not have an intention to marry Mr. Wardak, that Ms. Goolden was not romantically entangled with other men, that Ms. Goolden's sudden erratic behavior was due to her fraudulent enterprise and not a drug addiction, that Ms. Goolden

would never reunite with Mr. Wardak, but rather, she was operating a scam since the inception of their relationship solely designed to deceive Mr. Wardak and defraud him of his money.

143.    Mr. Cavanaugh made his misrepresentations to induce Mr. Wardak to give him more than $27,620 in monetary gain to Mr. Cavanaugh, not including the nonmonetary benefit of having many of his civil rights restored.

144.    The misrepresentations made by Mr. Cavanaugh and relied upon by Mr. Wardak would have been relied upon by a reasonable person.

145.    Mr. Wardak has suffered significant financial injury due to his reliance on the representations by Mr. Cavanaugh, totaling at least $617,620 of total costs to Mr. Wardak.

WHEREFORE, the Plaintiff, Hamed Wardak, demands judgment for damages against Defendant, Brian Cavanaugh, in the amount of $617,620, exclusive of interest and costs. The Plaintiff further demands prejudgment interest, costs and any other relief that this Court may deem just and equitable.

## COUNT III - Civil Conspiracy
### (against Ms. Goolden and Mr. Cavanaugh)

146.    Plaintiff reasserts and realleges paragraphs 1 through 133 as though fully set forth herein.

147.    Ms. Goolden and Mr. Cavanaugh agreed and explicitly conspired to work in concert in order to execute the Scheme.

148.    Each of the Defendants did the acts and made the specific misrepresentations alleged herein in furtherance of the Scheme.

149.    As a direct result of the wrongful acts committed by the Defendants and the Defendants' concerted efforts to perpetuate the Scheme upon Mr. Wardak, Mr. Wardak has suffered damages in the amount of $835,320.

WHEREFORE, the Plaintiff, Hamed Wardak, demands judgment for damages against Defendant, Brian Cavanaugh, in the amount of $835,320, exclusive of interest and costs. The Plaintiff further demands prejudgment interest, costs and any other relief that this Court may deem just and equitable.

## COUNT IV - Violation of § 772.103, Fla. Stat.
### (against Ms. Goolden)

150.     Plaintiff reasserts and realleges paragraphs 1 through 133 as though fully set forth herein.

151.     Ms. Goolden, through the fraudulent enterprise aimed specifically for defrauding romantic victims for their money, profited from a pattern of criminal activity.

152.     Ms. Goolden pursued the Scheme, engaging in at least two predicate acts of criminal activity, including:

   a) General fraud in violation of Fla. Stat. 817.155 by knowingly and willingly making false, fictitious, and fraudulent statements to Mr. Wardak that she loved him and intended to be his wife.   Furthermore, Ms. Goolden knowingly and willingly concealed the very material fact that she did not love Mr. Wardak and that she had no intention of being his partner.

   b) Conspiracy to commit fraud in violation of Fla. Stat. 777.04(3) by working in concert with Mr. Cavanaugh and agreeing and conspiring to commit fraud upon Mr. Wardak.

   c) A pattern of fraudulent racketeering activity by engaging in at least three other similar incidents her romantic fraudulent enterprise with the same intent, results, and methods of commission that are not isolated incidents. Ms. Goolden's other fraud victims include: Michal Sailor, Bill Dean, an ice hockey player from Canada named Jose, and Alex Pall.

   d) False reports of commission of crimes in violation of Fla. Stat. 817.49 for willfully conveying and imparting to a law enforcement officer false information as to Mr. Wardak harassing her, knowing this information to be

27

false and merely being asserted to evade scrutiny or confrontation for the spoils she unlawfully swindled from Mr. Wardak.

a) Violation of the Florida Communications Fraud Act for her use of communications technology in furtherance of her Scheme to defraud Mr. Wardak. The Scheme consisted of an intent to defraud Mr. Wardak by means of material misrepresentations. The subject material misrepresentations were made by use of the mails or wires, including the use of telephone conversations, text messages, and emails.

e) Tampering with witnesses in violation of Fla. Stat. 914.22 for engaging in misleading conduct towards the Potential Witnesses with the intent to cause or induce the Potential Witnesses to both evade legal process and be absent from an official proceeding. By sending a letter informing the Potential Witnesses that they not to respond to any subpoena served upon them despite no order granting a leave of stay, Ms. Goolden misled the Potential Witnesses into believing they could be absent from a proceeding despite legal process.

f) Perjury in official proceedings in violation of Fla. Stat. 837.02 when she falsely testified under oath in the Family Court proceeding on June 17, 2019, that Mr. Wardak had raped her and which she knew to be false.

153.    The multiple acts of criminal activity that Mr. Cavanaugh committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

154.    Mr. Wardak has suffered injury and incurred a specifiable amount of damages as the result of this pattern of criminal activity perpetrated against him.

WHEREFORE, the Plaintiff, Hamed Wardak, demands judgment for damages against Defendant, Sarah Goolden, including treble damages, attorneys' fees, and costs. The Plaintiff further demands prejudgment interest, costs and any other relief that this Court may deem just and equitable.

**COUNT V - Violation of Fla. Stat. 772.103**
**(against Mr. Cavanaugh)**

155.     Plaintiff reasserts and realleges paragraphs 1 through 133 as though fully set forth herein.

156.     Mr. Cavanaugh, through the Scheme aimed specifically for defrauding Mr. Wardak, profited from a pattern of criminal activity.

157.     Mr. Wardak pursued the Scheme, engaging in at least two predicate acts of criminal activity, including:

  b)   General fraud in violation of Fla. Stat. 817.155 by knowingly and willingly making false, fictitious, and fraudulent statements to Mr. Wardak that Ms. Goolden loved him and intended to be his wife.

  c)   Conspiracy to commit fraud in violation of Fla. Stat. 777.04(3) by working in concert with Ms. Goolden and agreeing and conspiring to commit fraud upon Mr. Wardak.

  d)   A pattern of fraudulent racketeering activity by engaging in the same fraudulent conduct by inserting himself in a fiduciary role and exploiting that trust to perpetrate the fraud.  Mr. Cavanaugh has previously pled guilty to committing mail fraud against his own client which resulted in his getting disbarred.

  e)   False reports of commission of crimes in violation of Fla. Stat. 817.49 for willfully conveying and imparting to a law enforcement officer false information as to Mr. Wardak threatening to "assassinate" Ms. Goolden's family.

  f)   Violation of the Florida Communications Fraud Act for his use of communications technology in furtherance of his Scheme to defraud Mr. Wardak. The Scheme consisted of an intent to defraud Mr. Wardak by means of material misrepresentations.   The subject material misrepresentations were made by use of the mails or wires, including the use of telephone conversations, text messages, and emails.

158.     The multiple acts of criminal activity that Mr. Cavanaugh committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

159.     Mr. Wardak has suffered injury and incurred a specifiable amount of damages as the result of this pattern of criminal activity perpetrated against him.

WHEREFORE, the Plaintiff, Hamed Wardak, demands judgment for damages against Defendant, Brian Cavanaugh, including treble damages, attorneys' fees, and costs. The Plaintiff further demands prejudgment interest, costs and any other relief that this Court may deem just and equitable.

## COUNT VIII – Defamation
### (against Ms. Goolden)

160.     Plaintiff reasserts and realleges paragraphs 1 through 133 as though fully set forth herein.

161.     Ms. Goolden made the false defamatory statements describing Mr. Wardak as an "arms dealer," a "stalker" a liar, and that he has a "baby dick."

162.     She made the majority of these statements to Mr. Wardak's business associates and individuals who work in Mr. Wardak's professional industry, causing harm to his career.

163.     Ms. Goolden made these statements knowing them to be false.

164.     Ms. Goolden has deliberately engaged in this contact in order to assassinate Mr. Wardak's character and credibility so that she can avoid culpability for the fraud she has perpetuated.

165.     As a result of those defamatory statements, Mr. Wardak has suffered actual damages, though the full extent of the effect that these statements has had on Mr. Wardak's music

career has not yet been fully realized.

WHEREFORE, the Plaintiff, Hamed Wardak, demands judgment for damages against Defendant, Sarah Goolden, exclusive of interest and costs, to compensate him for humiliation and injury to his reputation. The Plaintiff further demands prejudgment interest, costs and any other relief that this Court may deem just and equitable.

## **Demand for Jury Trial**

The Plaintiff requests trial by jury of all matters so triable.


## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served upon all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing on this 27th day of September, 2019.


**KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT**
*Attorneys for Plaintiff*
One West Las Olas Blvd., Suite 500
Ft. Lauderdale, Florida 33301
Telephone No.: (954) 525-4100
Facsimile No.: (954) 525-4300


By: *  /s/ Alexis Fields  *
ALEXIS FIELDS
Florida Bar No.: 95953
fields@kolawyers.com